Thank you, Your Honor. May it please the Court, I would like to reserve five minutes of my time for rebuttal. We are asserting two independent arguments on appeal. The first is that the entire judgment must be vacated because there is no evidence of the required causal link between the alleged retaliation here and the plaintiff's termination of employment. And the second argument is that at the very least, the punitive damage award is unfounded and must be vacated because none of the relevant actors were managing agents, as California law requires. Let me briefly take up the first argument on the compensatory damage liability. The question on compensatory damages is whether plaintiffs showed, with evidence, a causal link between her claim of discrimination in early 2002, in March, the beginning of March 2002, and the decisions on her job applications as much as 20 months later at the end of 2003 and the beginning of 2004. The sole basis upon which this jury verdict, an award of damages of $3 million in lost income, can be affirmed is if the plaintiff bore that burden to show that causal link between a complaint she made in early 2002 and job decisions made over 20 months later. Now, this question has been briefed at length in the party's briefs. I would just like to highlight a few points. First, this is not a matter of witness credibility or drawing inferences. Inferences must be based on actual evidence, not on speculation and conjecture. And our point is not that the jury should have believed our witnesses and rejected the plaintiff's witnesses. Rather, the problem is that even accepting all of her testimony is true and even rejecting the evidence of plaintiff's witnesses, the evidence of Chevron's witnesses, excuse me, the required evidence of a causal link here is just simply absent. And then let me just highlight a few points with respect to that question of the evidence. The issue here relates essentially to two job decisions. A plaintiff asserts in her brief that she applied for 15 or 16 jobs at the end of 2003, but she admits that she was not qualified for about half of those jobs, and she attempted to establish the causal link between her discrimination complaint and the job decisions only as to two of the jobs, two engineering positions in London and engineering positions in San Ramon. Now, we've discussed in our brief the evidence on which she relies to try to supply that evidence of causal link, causal link, excuse me. And without rehearsing that evidence, she illustrates why the assertions of the plaintiff in her brief in this court can't be taken at face value. And that's with respect to the San Ramon positions, which are really the centerpiece of her case. She relies on a conversation between David Kennedy, who was one of plaintiff's supervisors in a job that she had before the her time working for Rex Mitchell, and Zua Omaregi, who was the sponsor for these positions in San Ramon, and who was on the selection committee for that job. She asserts that Kennedy told Omaregi that Pandy had problems in Mitchell's group. Now, that's a critical assertion, because it's Mitchell is the one whom she claims was retaliating against her and infected this decision. But the testimony that she relies on contains no reference to Mitchell's group. So in her brief, Pandy tries to supply that missing link by selectively quoting and embellishing that testimony. If you read her brief, what she says is that when Ms. Pandy didn't get the promotion that Mitchell promised her, this is supposedly quoting Kennedy, this is what Kennedy supposedly said, that when Ms. Pandy didn't get the promotion that Mitchell had promised her, or maybe when the promotion in Mitchell's two ranking were not what she expected, her attitude changed. So if you read that, you think that Kennedy was explicitly referring to Mitchell. But the actual testimony contains no such references. There is no discussion of Mitchell in that testimony, in that conversation between Kennedy and Omaregi, and so they've tried to supply it. Now, they will argue that, well, the jury was entitled to draw that inference, and Chevron is not entitled to argue inferences on appeal. But again, inferences have to be based on evidence, not just on speculation. And it was undisputed that Pandy had been passed over for a ranking when she was in Mitchell's group, excuse me, when she was in Kennedy's group, and that she was unhappy about it. And there was no evidence that Kennedy knew anything about the ranking that Mitchell gave her or the promotion that she had hoped to get while she was in Mitchell's group, but she didn't get. So the inference that the plaintiff wants the jury to draw is unsupported by the evidence. Now, I highlight that one because I believe it's indicative of the nature of the plaintiff's arguments. And I think it illustrates the importance of going beyond the rhetoric that's in the plaintiff's brief and looking at the actual evidence. And I think when the Court does that, the Court will see that the required evidence of this causal link is absent. Let me then turn to the punitive damage question. California has a strong policy that punitive damages are discouraged. The California Supreme Court has referred to the, quote, universally recognized principle that the law does not favor punitive damages and that they should be granted with the greatest caution. Reflecting this policy, California law tightly restricts the circumstances in which punitive damages may be awarded against corporations. First, the person charged with acting with the requisite malice, oppression or fraud or having ratified or authorized it must have been an officer, director or managing agent. And second, these requirements must be established by clear and convincing evidence. Right. So then we get down to the question of really whether Johnson or Mitchell were managing agents, right? Why isn't Johnson a managing agent, given the testimony at trial that he's directly supervising a certain number of people and indirectly supervising, what, 3,000 or so? That's an assertion in the plaintiff's brief that he was indirectly supervising 3,000. That's over the whole 23 years of his experience at Chevron, at the, you know, adding it all up, 23 years' worth of employees in his various supervisory positions. At the time at issue here, the evidence is undisputed that his group consisted of he supervised three groups that had a total of about 25 employees. Twenty-five employees, right. We know from California law that supervisory authority is not by itself enough. And so the question is, what was his function in the corporation? Did he have the authority to determine corporate policy? And just like Mitchell himself, Johnson's position and the groups he supervised were all planning and analysis groups. And the record is absolutely uncontradicted that these groups had no policymaking decision, authority. So under your theory, who at Chevron would be, would qualify as a managing agent? The record shows that Mitchell and Johnson supported the management team of the I, you know, if the evidence were there, you would think that that management team would be the managing agents. But I think what's clear here Right. But I guess to extend your theory out further, I mean, it seems to be that if you take any large multibillion-dollar corporation, except for the president and maybe a handful of vice presidents, you don't have any managing agents under California law. Is that your position? No, that's not our position, Your Honor. But there is a requirement that they have, as the Supreme Court says, substantial discretionary authority to determine corporate policy. And when you have a group, wherever that line is drawn above the group that's at issue here, the group that's at issue here had no authority to determine any policy with respect to any part of Chevron's operations. This was a consulting advisory group that did financial analysis and crunched and ran reports to help with price forecasting and competitive assessments. And it was clear, if you look at the documents and the evidence that the plaintiff cites, that they provided recommendations to the corporate management. Are you drawing a line between what used to be called line functions and staff functions on an orange chart? So people have line functions and then some people sit up here in a little box and they give advice. Is that the way you draw the line? I think that it – certainly in this case, Your Honor, the fact that this group was an advisory group, a small – remember that this corporation has 15,000 employees. And we're talking about a group that has in it – Mitchell's group had 7 or 8 employees. The groups that Johnson supervised had 20 to 25 employees. Out of a corporation with – out of a part of a corporation that had 15,000 employees. And their function, as shown in the job posting, as shown in the very testimony upon which the plaintiff relies, was to provide technical support services to the management team. Now, if we're talking about the actual managers of the company, then, yes, we would have the difficult question that Your Honor has been referring to about, okay, where do you draw that line between those who are the corporate policymakers and those who are not. But here, we're not even talking about people who had any management authority at all. The best that can be said is that they had the authority to supervise their group. And – but the California Supreme Court has clearly held that that's not enough to support punitive damages. How do you distinguish the case where the person was an area manager for eight stores? Presumably, if you only managed one store, that's not good enough. I don't know. But there's a person who's just an area manager. Doesn't – I don't know if that person sets corporate policy or not. Your Honor is referring, of course, to White v. Ultramar. The Supreme Court there, in a very brief, almost afterthought portion of the opinion – Well, it's part of it, so. – said that the manager there was responsible for the actual management of a, quote, significant aspect of Ultramar's business. And the Court relied on the fact that her superiors delegated most, if not all of the responsibility for running the stores in her area to her, thus giving her the authority to act independently. That was the language the Supreme Court used. And I think it's important to also look at the case that the Supreme Court endorsed, which is the Kelly-Zurian case decided several years before. In the holding of that case, the Court endorsed both the test that was adopted in that made in that case. And there, the manager in that case was one step up from a regional supervisor. He had two regional supervisors that reported to him. But the Court found that he was not a corporate policymaker because he had the authority only to advise and make recommendations to the actual corporate policymakers who were in the St. Louis office. And it was that group that actually set corporate policy. So I think that case is the one that's analogous to the situation here. Well, and it depends on what you mean by corporate policy, too. But let's assume hypothetically that someone has management authority over $6 billion of assets, that they have a certain amount of discretion to manage those assets in any corporate setting. Isn't that person a manager or agent within the meaning of the statute? Perhaps, Your Honor. But the important point here is that Johnson and Mitchell had no such authority. Complaints allege otherwise, as you know. Well, the question, though, is what their evidence is. And let me just go to that. They rely on the plaintiff's testimony who says that she determined how the funds will be invested. This is at page 9 of their brief. But if you look at her actual testimony, which is at pages 67 and 68 of the excerpts of record, she says that she only worked with the business units as an analyst to help them coordinate their business plans and other funding requests. She admitted that the business units actually run the business, not the analysts like Pandy or Mitchell or Johnson. That's at ER 67. She then cites a job, a summary of her job that was in the posting for the job, where she says that Mitchell's team, quote, managed and directed expenditures of $8.3 billion. That's page 9 of her brief. But if you look at the summary, it shows just the opposite. It shows that Mitchell and his group only made, quote, recommendations to the COPE management team. That's ER 245. And that Mitchell's group was assigned to conduct economic analysis, develop methods and tools for evaluating performance, and support activities associated with the planning cycle. This was a support and advisory role. It was the COPE management team that had the authority that White versus Ultimar refers to of actually running the business and determining corporate policy. We're down to about a minute. Yes. Let me reserve that last minute if I could, Your Honor. Mr. Hirsch. Good morning. May it please the Court. Steve Hirsch for Plaintiff and Appellee Karen Ponday. And with me at council table is my law partner, Susan Harriman, who tried the case. I'd like to loop back to the question of the Omaregi testimony and Kennedy's knowledge of the relationship between Mitchell and Ponday. But first, I'd like to address head-on the managing agent question. Now, first of all, the district court's instructions in this case quoted the leading case, White versus Ultimar, which defined a managing agent as someone who exercises substantial independent authority and judgment in his or her corporate decision making such that his or her decisions ultimately determine corporate policy. Chevron not only did not object to this instruction, but they jointly proposed it with Ms. Ponday. There was no attempt to further particularize it. There was no attempt to add to it the rule that they now purport to find in the Kelly case. There was no attempt to do anything more specific than that. And there's actually a good reason for that. The Supreme Court has described this loosely phrased test as a question of fact for decision on a case-by-case basis. This is, in fact, not an area of law governed by bright-line rules of any kind. It's governed by a broad standard that delegates a great deal of discretion to fact-finders. So what they're really doing is quarreling with the way the jury used that discretion granted by the California Supreme Court. They say it has to be based on evidence. That's right, Your Honor. And so let me review that evidence. Right. What the district court concluded, before we just get into the evidence of the case, the district court said, basically, that it was enough under California law that Mitchell was a manager of the strategic planning group, that it was an important group, and he had day-to-day operation, controlled the group, responsible for employee discipline, promotions, and salary recommendations. Is that sufficient under California law as to Mitchell? Your Honor, I would argue it is, but it's by no means all the evidence that was there in the trial. No. I just want to focus on what the district court did first, and then I don't want to deter you from your evidentiary analysis. And then it goes on to Johnson saying he was Rex Mitchell's boss, general manager of business development and planning. Both of these individuals had substantial independent authority in decision-making, and their decisions within that authority ultimately determined corporate policy. Is that enough? I would say it is. I mean, if you are in, to take Judge Fernandez's example, if you're in a staff position as opposed to a line position, and your recommendations become policy, do you think that's enough under California law? I think it's a case-by-case inquiry that doesn't lend itself to bright-line distinctions like line versus staff, which, by the way, is a distinction that no California case actually draws. And I think that on the facts of this case, the jury was well within, you know, its discretion to find that these were both managing agents. I interrupted your answer to Judge Fernandez's question, so why don't you proceed with your evidentiary analysis of this. Sure, Your Honor. So Mitchell's group was responsible for analyses and business recommendations affecting more than $8 billion in capital and exploratory investment programs. What does affecting mean? I'm sorry? What does affecting mean? If I have, if I am, if I'm the, an advisor to the president of, I won't say, well, let's say General Motors, what the heck, the president of General Motors, my advice affects zillions of dollars, affects it. Does that make me a corporate manager, et cetera, within the meaning of California law, just the fact that I give advice and sometimes they take it? That's good enough? Quite potentially, Your Honor. And I'd like to hark back to the point that Judge Thomas makes. This is, it's realistically understood by everybody that in large organizations, policy is a process that can involve dozens of people, some of whom are highly influential but do not have the power to single-handedly adopt or veto policy, which appears to be the new test that Chevron is now proposing, even though they never proposed it in instruction time. No, but that's the point of the California, isn't that what the California statute says, something to that effect? No, Your Honor. It says exactly. How does it put it exactly? Well, the White v. Ultramar is the case. No, the statute. The statute says, Your Honor, that the advanced knowledge and conscious disregard, authorization, ratification, or active oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation. And by the way, that tells us something very interesting, because when the California Supreme Court was analyzing what is officer, director, managing agent, they used what was called the adjust and generous principle. And they said, well, managing agent is a general term. Officer and director is very specific. So we're going to use the specific words to interpret the general. What do all three of these things have in common? And they came up with this test. They all exercise independent, substantial independent authority over their decision making, such that their decisions ultimately determine corporate policy. Well, that includes a director. And a director can't do anything by himself. It's an inherently consultative job. So they're trying to impose. By director, you mean? A director on the board of directors of a corporation. Well, he's aggressively patched in. That's right. But what the California Supreme Court said in White v. Ultramar is, we're going to find the common thread between these three terms, officer, director, and managing agent. And what they all have in common is this test, that they ultimately determine corporate policy. Directors do ultimately determine corporate policy. A director does not. Well, we can say a congressman does not either. Nor does a senator. I mean, nor does any judge on this court. Careful now. That's a little bit over the top if you're going to say, oh, well, as long as you have to vote with two other people, that's good enough. I mean, that's what we're talking about. And therefore, anybody who has any input is a director. Well, these weren't folks that just had any input, Your Honor. I mean, the evidence showed, for instance, and I think this is significant, the jury was entitled to infer from Mitchell's next job that he had been a managing agent, because what was his next job? From his what? His next job. Was chief financial officer for Chevron Canada. Now, you don't have to be someone who's worked in a big corporation to understand that Chevron wouldn't promote a non-managerial employee to become the CFO of a major affiliate. The jury was entitled to infer that he couldn't become a CFO unless he'd been a managing agent. Well, let me take a different tack, and I guess I'm trying to work our way through California law on this. Let's assume you just manage a division. You're indisputably in a line position, as we would call it. You manage a division. Is that enough in a large corporation to be considered a managing agent? So you manage a number of employees and you make all the policy? Your territory is you manage all of Chevron's activities in California. Is that enough? I would say so, Your Honor. Now, here you have a slightly different situation, because you have a strategic planning group that is basically giving advice. So forget that, whether or not it has consequences or they have the ability to control. Is the management of that division enough to be considered a managing agent? Yes, Your Honor, particularly on the facts of this case.  And these folks were making capital allocation recommendations that were equal to like a third of the value of the company. Now, there's no CEO who makes those kinds of judgments on his or her own. There's no policymaker who has the ability to just sort of up or down policy  without having it analyzed by a range of professionals with highly specialized skills. And Mitchell was sitting on top of that and Johnson was sitting on top of him. How about someone who manages a grocery store? Someone who manages a grocery store. For a major chain of grocery stores. He manages a grocery store. A grocery store. And he can hire and he can fire. And the way a lot of these big chains work, he can decide what product he's going to order in and how he's going to order it and et cetera, et cetera. How about somebody like that? Yeah, I think, Your Honor, that it is clear under White v. Ultramar that mere supervisory authority is insufficient. Well, I'm giving you somebody who's not just a mere supervisor. He manages a grocery store. He's managing 80 people. Well, we have 90 people. You know all the things this guy does. Your Honor, if this was the model experimental grocery store and all of management was looking to it for development of policy because it was a special grocery store in some sense, yeah, maybe, but in most cases on the facts that you've given me, that probably wouldn't be a position from which corporate policy could be developed. And so I would say in most cases on the facts you've given me, that would not qualify. So he's not a person who makes corporate policy. He just has to be a person who gives advice that corporate policy is made out of. Is that right? On your view. On my view, if a person is involved in the policymaking apparatus of the company, and that's what these folks were. They were in the policymaking apparatus of the company and very high up in it in a very elite position. That is determining corporate policy. It's not like you have the single-handed power to veto or adopt it, but who does? Very few. Single-handed? If you have any power. If I understand, he had no power. He doesn't have a vote in it. Is that correct? He makes recommendations like somebody might to a board of directors. He makes recommendations and then the people with power decide to accept them or not accept them or to make policy or not make policy. Am I wrong? Well, Your Honor, let me. The evidence. I mean, really. I think that's kind of like saying that the president's national security advisor is not a policymaker in the administration. He is. I don't think anybody could argue that. Well, it's an interesting distinction. I mean, you'd say obviously the secretary of state would be a policymaker. Is a security council advisor a policymaker because the person is a principal policy recommender? It's an interesting question because obviously it's an odd situation and analogous here because this group is charged with policy. Exactly, Your Honor. But they didn't make policy. And I don't know whether that difference is crucial or not. Well, let me. I'll just add as a final point because I'm running out of time, that if they had wanted to particularize the jury instruction in that way, they should have argued for it below and they should have proposed the narrowing instruction that they now seem to be seeking backdoor through a substantial evidence review question. You have two minutes left if you want to use it. Oh, I'm sorry. Not that I'm encouraging you, but. Well, just briefly then, unless there are more questions on the punitives. Are there? No, I just didn't want you to omit something. No, I'm sorry. Well, I did want to just briefly address the two questions on causation. First of all, the Zua Omaregi testimony. The jury had all it needed to infer that David Kennedy was channeling Mitchell's criticisms to Zua Omaregi in this disputed bit of testimony. You'd agree. There's no direct evidence. It's purely an inference that the jury had to draw. Your argument is they could draw it. Their argument is, no, they can't. It's not just that they could draw it, but it was by far the most rational and reasonable inference to draw because he was talking about the confluence of three events, a change in attitude on Ponday's part, a missed promotion, and a ranking that she debated or disputed. And the jury knew by this point in the trial that the only manager who had both denied her a promotion and given her a ranking that she vociferously disputed in her written review was Rex Mitchell. There was nobody else. Now, they've also quarreled with the fact that David Kennedy didn't give her so much a negative ranking, but at one point called her not high potential or something like that. But that doesn't help them at all because Ponday didn't learn of that until she was already working for Mitchell. So no matter how you slice it, Kennedy was channeling Mitchell. Kennedy was being the cat's paw for Mitchell. The last thing I just wanted to take on, if I still have any time. Was the jury instructed on a cat's paw theory? I don't recall that, no. I don't think they were, but there's no complaint that they should have been. So, Your Honor, there was also a statement that there's no evidence that Kennedy knew of Mitchell's situation with Ponday. That's just wrong. That's against the evidence. In 2002, there was an exchange of emails in which Kennedy learned all about his situation with Ponday and promised to support him in court no matter what happened. So with that, my time is up. Thank you. Thank you. I'll just rely on our brief for the point about Kennedy and Omaregi. I think our brief responds to the argument we've just heard. On the punitives, the standard under California law is clear and convincing evidence. The plaintiff had the burden to show by clear and convincing evidence that the actors here were managing agents. So the question is, what did she put in the record to show that? We've heard here that, well, this group shaped or influenced or affected in some sense the decisions of the corporate policymakers and that that's enough. I think it's critical to note, however, that there is no evidence on the degree to which even that they shaped or influenced those decisions. The record is striking here in the real absence of evidence on this managing agent point. There's no discussion about the corporate hierarchy and where this group actually fit in the overall structure. There's no testimony from anyone about the degree to which their recommendations and their analysis actually influenced any decision. So when you look at the burden of clear and convincing evidence that they're required to show, we think it's not even a close case that the plaintiff has failed to meet that standard. It's not a matter of the jury instruction. The jury was instructed in accordance with California law that these people had to be corporate policymakers. The problem is there's just simply no evidence showing that they were. And that's the reason why at least that portion of the judgment must be vacated. Thank you, counsel. The case just heard will be submitted. Thank you both for your arguments. Interesting case, an important case. And we are in recess. All rise.
judges: Aldrich, Fernandez, Thomas